# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JONTUE A. HUDDLESTON,**

               **Plaintiff,**

-vs-                                    **Case No.  6:12-cv-1273-Orl-DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

               **Defendant.**

_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Although oral argument was requested by Plaintiff's counsel, it would not provide any further assistance in reaching a decision. Doc. 17.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## I.       BACKGROUND

### A.       Procedural History

Plaintiff filed for a period of disability, DIB[1] and SSI benefits on November 26, 2003. R. 144, 573[2]. She alleged an onset of disability on January 2, 2002[3], due to unpredictable seizures, memory loss, headaches, and blackouts. R. 144. Her application was denied initially and upon reconsideration, and Plaintiff requested a hearing, which was held in Alaska on August 1, 2007, before Administrative Law Judge Henry M. Tai. R. 570- 597. ALJ Tai denied Plaintiff's claims on September 28, 2007. R. 52-63. Plaintiff timely filed a Request for Review of the ALJ's decision, and in an Order dated May 15, 2009, the Appeals Council remanded the case to the ALJ. R. 65-67. In its Order, the Appeals Council remanded the case to the ALJ for an adequate evaluation of the treating source opinions from Dr. Pervier and Dr. Makim; the third-party statement of Minerva Colon; and Plaintiff's subjective complaints. R. 66. The ALJ was directed to give further consideration to Plaintiff's maximum RFC, obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's impairments, and obtain vocational expert testimony if necessary. R. 66-67.

Plaintiff relocated to Florida (R. 97), and her second hearing was subsequently held in Orlando, Florida on January 19, 2010, before Administrative Law Judge Philemina Jones (hereinafter referred to as "ALJ"). R. 598-687. In a decision dated April 8, 2010, the ALJ found Plaintiff not disabled as defined under the Act through the date of her decision. R. 16-26. Plaintiff timely filed a Request for Review of the ALJ's April 8, 2010 decision[4] which the Appeals Council denied on June 14, 2012. R. 5-7A. Plaintiff filed this action for judicial review on August 17, 2012. Doc. 1.

### B.   Medical History and Findings Summary

---

[1]To be eligible for DIB, Plaintiff was also required to prove her disability began before her insured status expired on June 30, 2002. R. 148. See 42 U.S.C. §§ 416(i)(3), 423(a), (c); 20 C.F.R. §§ 404.101, 404.130, 404.131.

[2]Earlier applications referenced in the 2007 decision by ALJ Tai and at the hearing are not in the Record.

[3]Under the Social Security Regulations, SSI benefits are not payable for the month, or any months prior to, the month in which the claimant filed her SSI application. 42 U.S.C. § 1382(c)(7); 20 C.F.R. § 416.335.

[4]This decision apparently only considered eligibility in relation to a period beginning January 2, 2002. See R. 16, 18, 25-26.

Plaintiff was born on December 3, 1981, and therefore had just turned 20 years old as of her alleged onset date of January 2, 2002. R. 144. Plaintiff has a ninth grade education and unsuccessfully attempted to obtain her GED.  R. 595, 604. She had worked as a maid/housekeeper, cashier, and cinema ticket taker. R. 145.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of seizures, memory loss, headaches, and blackouts.  R. 144, 226, 235, 283. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from seizures, migraine headaches, a mood disorder and drug and alcohol abuse, which were "severe" medically determinable impairments, but were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 18.

The ALJ determined that Plaintiff had engaged in no substantial gainful activity since January 2, 2002, only work activity in 2002 and 2005 that did not rise to that level.  R. 18. The ALJ also determined that Plaintiff retained the residual functional capacity (RFC) to perform light work except she must avoid all exposure to hazards; never climb ladders, ropes or scaffolds, due to seizures; and can perform only simple tasks on a regular basis. R. 24.  The ALJ determined that Plaintiff had no past relevant work, but based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as cashier or ticket take and housekeeper. R. 25-26.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 26.

Plaintiff now asserts three points of error.  First, she argues that the ALJ erred by finding she had the RFC to perform light work based on a mischaracterization of the medical expert's testimony. Second, Plaintiff contends the ALJ erred by improperly assessing her mental impairment. Third, she argues that the ALJ erred in evaluating her credibility. For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## II.        STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11ᵗʰ Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11ᵗʰ Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11ᵗʰ Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004).  "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11ᵗʰ Cir. 2005).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11ᵗʰ Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she

is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from

doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's

impairments (considering her residual functional capacity, age, education, and past work) prevent her

from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. §

404.1520(f).

# III.    ISSUES AND ANALYSIS

## A.    RFC and the physician's opinion

Plaintiff argues that the ALJ's physical RFC assessment is inadequate as a matter of law and

relies upon a mischaracterization of the medical expert's testimony.  The Commissioner argues that

substantial evidence supports the ALJ's evaluation of Plaintiff's seizure disorder.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's

remaining ability to do work despite her impairments.  20 C.F.R. § 404.1545(a); *Lewis v. Callahan*,

125 F.3d 1436,1440 (11th Cir. 1997).  The focus of this assessment is on the doctor's evaluation of

the claimant's condition and the medical consequences thereof.  *Id.*  Substantial weight must be given

to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to

do otherwise.  *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d),

416.927(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments

is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Where a treating physician has merely made conclusory

statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings

and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073,

1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ determined Plaintiff's severe impairments included seizures, and she could perform light work except she should avoid all exposure to hazards and never climb ladders, ropes, or scaffolds.  R. 18.  The Commissioner contends the ALJ based her findings on medical opinions and other substantial evidence in the record.  R. 20-25.  The Commissioner argues that the ALJ appropriately gave significant weight to the opinion of Dr. Justin Willer, the medical expert board certified in Psychiatry and Neurology who testified at the (second) hearing on January 19, 2010.  R. 87.  The ALJ's and, in turn, the Commissioner's interpretation, is that Dr. Willer testified that the evidence in the record did not establish that Plaintiff had "epilepsy," and Plaintiff's "self-reported seizures were suspicious (based on her motivation to obtain disability forms over treatment), her continued potentially adverse use of marijuana, poor medication compliance, treatment notes indicating memory improvement over time rather than deterioration, and subjective complaints of memory loss inconsistent with seizure symptoms.  R. 652-57.  The Commissioner continues:  "Given these suspect facts, Dr. Willer was unable to classify Plaintiff's seizure impairment as epileptic or psychogenic (Tr. 657).  A psychogenic seizure is a clinical spell that resembles an epileptic seizure but is not due to epilepsy; the EEG is normal during an attack, and the behavior is often related to psychiatric disturbances.  STEDMAN'S MEDICAL DICTIONARY (28th ed.).  However, regardless of the exact nature of Plaintiff's impairment, Dr. Willer noted Plaintiff's seizures limited her ability to drive or be exposed to other hazards, such as power tools."  R. 658.

Plaintiff argues that the ALJ erred in giving limited weight to the treating source opinions and lay evidence and giving "significant weight" to the opinion of Dr. Willer and weight to the conclusions of  nonexamining State agency physicians (without citation to the record). R. 21-22, 24.  Plaintiff argues that, even assuming that the ALJ properly rejected the treating source opinions and relied on Dr. Willer's testimony, the ALJ's decision cannot be upheld since the ALJ mischaracterized and apparently misunderstood the expert's testimony.

Plaintiff argues that Dr. Willer actually testified that more information was needed in order to reach a conclusion about her seizures and limitations.  Plaintiff points to Dr. Willer's testimony that Plaintiff might be unable to work due to uncontrolled seizures and it was "very possible" that she met the listing for psychogenic seizures. R. 659.  She also argues that Dr. Willer had no doubt the seizures were in fact taking place and the main question was primarily whether they were psychogenic or, if they were epileptic, Dr. Willer opined that noncompliance with medication would prevent Plaintiff from meeting a listing. R. 659-62.

Plaintiff argues that the ALJ erred because, instead of developing the record to determine the nature of Plaintiff's seizures as advocated by Dr. Willer and providing a logical discussion of the evidence, the ALJ rendered her decision without even  addressing whether Plaintiff suffered from epileptic or psychogenic seizures. The Court agrees that the ALJ's opinion – which failed to address what sort of seizures Plaintiff was having and the impact of treatment or non-compliance with prescribed medication as set forth in Dr. Willer's opinion  – was not based on substantial evidence. The failure of the ALJ to address the lengthy and conflicting evidence of the cause(s) of Plaintiff's seizures and the impact on her functional abilities was error, particularly in light of the AC's remand for the ALJ to "obtain evidence from a medical expert to clarify the nature of the claimant's disability." *See* R. 21.

The ALJ found Plaintiff's seizures and migraine headaches were severe impairments, but singly or in combination, and she found that they did not meet a listing,. R. 18-19.  The ALJ found Plaintiff had the severe impairment of "seizures," but did not specify which kind of seizures or the source or nature of Plaintiff's seizures.  R. 18, 19.  In discussing Plaintiff's RFC, in the section entitled "obtain evidence from a medical expert to clarify the nature of the claimant's disability," in a comparatively short, two-paragraph summary the ALJ found:

> Justin Willer, M.D. testified at the hearing that if the claimant had had the number of seizures she said that she had during her pregnancy, her unborn baby would have been

affected and would have been born with problems. After the six seizures in a row that the claimant alleged, he did not believe that she could just walk out of the hospital; and questioned whether the claimant was even hospitalized, since the treatment records were not in the record. Dr. Willer also noted that the claimant was non compliant with medical advice and recommendations. He noted that the claimant's treatment history was sporadic despite the seriousness and frequency of the seizures that she alleged.

Dr. Willer also stated that stress does not cause an increase in epileptic seizures, as the claimant has alleged. He noted discrepancies in the doctors' reports and questioned whether the claimant has a real seizure disorder. He opined that the claimant's descriptions of her symptoms do not describe a seizure disorder. He also opined that Tegretol was not the primary medication that he would use to treat epilepsy. The undersigned has assigned significant weight to the opinion of Dr. Willer because of his board certification in psychiatry and neurology and because his opinion is consistent with the medical evidence of record.

R. 24.

Despite the brevity with which the ALJ addresses his testimony, Dr. Willer testified at significant length about the nature of the two kinds of seizures Plaintiff could be suffering from, the different treatments for the two types of seizures, and the impact of the treatments.  In fact, when the ALJ asked Dr. Willer point blank if he had reached a conclusion about Plaintiff's condition, he testified he could not:

Q Now, do you feel that the record before you is sufficient [enough] to reach a conclusion as to the claimant's medical condition as it pertains to her seizures?

A No, it is not.

Q And why isn't it? Or, why don't you feel it is?

A Okay. The record documents that she's had several EMG's which show epileptiform discharges that are generalized with a frequency ranging from about one to two cycles per second to three to four. This demonstrates a potential to have seizures. These are all what we call, interictal, which is not recorded from her episodes. This does not establish that she has epilepsy. . . . The only thing that would establish it would be by recording the EMG during an event, and recording that it's a bona fide epileptic seizure. Now, according to the record, it indicates she has headaches and grand mal seizures. However, the note from May 23, 2007 from Dr. Macum, who is her treating source, indicates that what they refer to as a grand mal seizure, this would be it, body gets stiff, convulsive, whole body movement; then, she falls. The problem with that is, if one gets stiff when one is having a bona fide seizure, he would not remain be able to remain standing. So, this description of her generalized tonic clonic seizures is very suspicious that this is not an epileptic generalized tonic clonic seizure. . . .Second of

all, okay, then, we have where she says her seizures are worse with stress. Bona fide epileptic seizures don't get worse with stress. They get worse with sleep deprivation, they get worse with not taking the medication. I can't really explain that. The next point I really can't explain is, Tegretol would do nothing for primary generalized seizures, which are primarily the seizures -- discharges she has. She clearly says it helps. Now, the only general -- primary generalized seizure disorder that I'm aware of that Tegretol works, and that's a very, very minority of patients, is a juvenile myoclonic epilepsy. But that's only about 10 percent of people with JME. There's no evidence she has myoclonic, which are sudden jerky movements in the arms and legs, and, the characteristic EEG finding is that generalized (INAUDIBLE), which she doesn't have. So, I can't really explain at all why she's on Tegretol, because the EEG would suggest that she needs to be on a medication for primary generalized seizures. So, second of all, there's no indication in the record that she had any major side effects from Depakote. All the notes I see, when she was actually taking it, don't document anything. So, if you were going to stop something, you would stop the Tegretol, not the Depakote. Then, she was put on Keppra, and instead of stopping the Tegretol, she stopped the Keppra. So, if she was really having epilepsy that, according to this, is primary generalized, I can't explain why she's on Tegretol, because that doesn't really make much sense. The other there's a number a couple of other suspicious things. Her treating source refers to that she has -- comes in complaining of a seizure and a major concern with her Disability form. That, I can't really explain. Somebody who's just had a bad seizure, their primary concern is the seizure, not the Disability form, and I can't really explain that. Then, we have the effects of marijuana. The effects of marijuana are conflicted. Some of the studies -- one controlled study said it helps epilepsy, which, there's no evidence it helps; and other reports say it makes it worse. So, she's continuing to smoke that, marijuana, it is possible that the marijuana itself is contributing to the numbers of seizures she's had, so I don't understand why she's continuing to smoke marijuana. The record (INAUDIBLE) that she is not completely compliant with her dose. She's mostly taking -- the levels I see are either basically in expected range or slightly low. That means she's taking it most of the time, but the note from Dr. Macum of February 1, 2007, says that she misses doses, which is probably the explanation why her levels get low. It is possible sometimes, the Tegretol levels will drop without warning if you are taking it; but where the record indicates she's skipping doses, the more likely explanation in that particular case would be that she's not compliant with her medication, despite the statements that she is. Now, there's a report of neuropsych testing from a Dr. (INAUDIBLE). Now, the problem with these reports is that in August of 2001, it says that she's got significant memory deficits; and on April 14 of 2004, it says, normal memory. I can't really reconcile that, because (INAUDIBLE) epilepsy or the seizures themselves, her memory was horrible, then having more seizures wouldn't improve your memory. If anything, it would either leave it the same or make it worse, so I can't explain that at all. Then, I also can't explain why she doesn't recognize her daughters or family members after she – while she – after she wakes up after an event. Seizures will preferentially attack the area of the brain that's responsible for short-term memory. Long-term memory is much less affected than short-term memory. So, I can understand her being groggy and out of it, and not, you know, basically not being that responsive, or sleepy; but I wouldn't -- I mean, I can't really reconcile how somebody can be awake enough to be talking, and say, okay, I don't -- you know, and to not recognize, you know, family members,

which would really be from long-term memory, so I can't explain that. And the other thing is, stuttering episodes can be psychogenic, they can be real, okay? The only stuttering episode I've ever seen in a patient, it turned out the description was wrong. It wasn't actually stuttering. It was something quite different. The patient just called it, stuttering. So, that could be psychogenic. The problem is, if I'm looking at this record, I can't tell if her events are completely psychogenic, some of them are bona fide epileptic, some of them are seizures, some of them being provoked by marijuana; and whether or not, you know, the headaches also basically are real migraines, or basically psychogenic, because the notes refer to (INAUDIBLE) from Dr. Smith, her treating source, is, it started chronic daily from age 12. Well, transformed migraines usually don't start out that way. Transformed migraines usually start as episodic migraines; and then, at some point either months or years later, they transform into daily headaches. So, that's a bit odd to me, and the thing is, based on what I've seen in the whole record, I can't tell you whether this might be conversion disorder, okay? Conversion disorder; and she has some bona fide seizures, that is all true epilepsy, and some of the episodes are being triggered by smoking marijuana; or this is all true epilepsy, and marijuana has nothing to do with it, and she also has some concurrent psychiatric problems. This is not sufficient. *In order to parse this out, one would need her admitted to an epilepsy monitoring unit, which should be fairly easy to report, because she says she has two or three grand mal seizures a day, and you'd be able to see whether or not these events . . . were actually bona fide epilepsy, or whether they were completely psychogenic, or whether or not, you know, it was a mixture.*

R. 652-58.

At the end of this lengthy analysis, the ALJ asked Dr. Willer a second time: "My initial question to you is whether or not you could make any determination based on the documents in the record as to what her medical condition was; and you initially said, no. So, are you able to make a determination as to what her medical condition is, as far as her seizures?" R. 658. Dr. Willer – for a second time – gave an equivocal response:

No, I'm not, because I can't tell you whether this is all a psychogenic event; whether this is mixed psych, some events that are bona fide epilepsy, and other events that are not; if it's all bona fide epilepsy; then, or if some of her events are being triggered by her marijuana smoking. I cannot differentiate based on the record in front of me.

R. 658. In response to Dr. Willer's equivocation, the ALJ asked him if he had an opinion as to what impairments Plaintiff had, and he responded:

I can say that, at least at the present, she would not be able to drive a car, whether it was a psychogenic episode or basically bona fide epilepsy, or use power tools. *But beyond that, it's difficult to say, because the degree of impairment she described is not in keeping with, you know, what you see in epilepsy.* She's, you know, incapacitated

-10-

now like she almost has it sounds like she has agoraphobia that she can't even go out of the house, which is -- would imply a psychiatric problem, not really as a result of her, you know, not, would not be the result of an epilepsy. *So, it would be difficult to say what exactly her impairment is, because you would need to, number one, know which one you're dealing with. In other words, is the epilepsy incorrect? Because she's choosing basically Tegretol instead of an appropriate medication. If it's psychogenic, then is it, you know, anticonvulsant at all? If it's a mix, then it's basically psychotherapy, psychiatric treatment, and anticonvulsant, and it will be very hard to basically determine what's real or not.*

R. 659 (emphasis added).

The Commissioner's argument that "regardless of the exact nature of Plaintiff's impairment, Dr. Willer noted Plaintiff's seizures limited her ability to drive or be exposed to other hazards, such as power tools" is disingenuous and misrepresents the nature of Dr. Willer's actual testimony. Dr. Willer's actual testimony was that it would be "difficult to say" exactly what Plaintiff's impairments would be, and further testing was necessary to determine the cause of her seizures. R. 659.

When asked whether he agreed with Dr. Makim's opinion (Ex. 26F - R. 480) that Plaintiff could not work due to uncontrolled seizures, Dr. Willer again equivocated:

I can't agree or disagree with that at this time, because in order to make – to determine whether or not she could work, one would need to have an answer as to whether this is psychogenic, because it's very possible, if this is psychogenic, she would meet a listing under psychogenic seizures, because there is a separate listing for that. One could not say that without having some idea. So, even if it's psychogenic, she still might not be able to work; but if you can't tell, it's really hard to say which is correct. Because if it's epilepsy, and she's refusing to take the correct medication, that would fall under the area of noncompliance, in which case she would not meet a listing; whereas, *if it's psychogenic, and (INAUDIBLE) she might not be able to work, and she might meet a listing.*

R. 659-60 (emphasis added).

The ALJ relied upon and described Dr. Willer's testimony as simply: "question[ing] whether the claimant has a real seizure disorder. He opined that the claimant's descriptions of her symptoms do not describe a seizure disorder." R. 24. Dr. Willer actually testified to something quite different – that "it would be difficult to say what exactly her impairment [is] . . . because you would need to, number one, know which one you're dealing with." If Plaintiff suffered from a combination of causes,

-11-

then treatment would have to include "psychotherapy, psychiatric treatment, and anticonvulsant, and it will be very hard to basically determine what's real or not." R. 659. Plaintiff contends that if the ALJ assumed her seizures were psychogenic, it was error for the ALJ simultaneously to fault her for non-compliance in taking the Tegretol medication that Dr. Willer testified would not help psychogenic seizures. R. 24 ("Dr. Willer also noted that the claimant was non compliant with medical advice and recommendations")[5].

Plaintiff's neurology records from 2001 to 2008 reflect that her neurologists repeatedly noted that she could have multiple or complicating causes for her seizures.  However, Plaintiff's neurologists continued to treat her for a "seizure disorder" and continued to prescribe Tegretol for her, even when they recognized her seizures were more complicated than solely epileptic.  Plaintiff began having seizures at the age of 12, and at 15 years old, the abnormal results of an electroencephalogram ("EEG") were diagnosed as "characteristic of generalized seizure disorder after absence type of seizure disorder"; she was prescribed Tegretol.  R. 297, 304, 306, 309.

Dr. Farber, a neurologistist, began treating Plaintiff in October 2001 and noted an EEG from June 14, 2001 "revealed findings consistent with primary generalized epilepsy with high-amplitude, slightly irregular spike and slow-wave discharges at 3-4 per second." R. 315, 319 (abnormal EEG interpreted as "consistent with a primary generalized corticoreticular epilepsy"). Plaintiff still had occasional seizures despite taking Tegretol, and the seizures became worse when she was switched to generic tablets. R. 316.  Plaintiff's seizures continued throughout 2002 and 2003, as noted in Dr. Farber's treatment notes. R. 384 (October 2003), 386 (2-3 seizures per week as of February 2003); R. 387 (November 2002); R. 388 (January 2002). In August 2004, Plaintiff reported that overall her

---

[5]Plaintiff additionally argues that, even if the ALJ had determined unequivocally that Plaintiff had epilepsy, the ALJ's lack of consideration of evidence that may explain "infrequent or irregular medical visits or failure to seek medical treatment" violated the Social Security Rulings which require consideration of such evidence.  SSR 96-7p, 1996 WL 374186.

seizures had "improved significantly." R. 383.  In November of 2004, Plaintiff moved to Alaska.  R. 418.

In Alaska, Plaintiff initially saw Dr. Smith of Susitna Neurology in April 2005, who diagnosed her with primary generalized seizures, intractable. R. 427.  Plaintiff reported being on Tegretol name brand since she was 12 years old. R. 427.  The impression from a May 2005 EEG was "borderline" EEG due to two episodes of changes in patterns without behavioral changes; the findings were "not diagnostic of seizure disorder, but given her history may be considered somewhat suspicious. Clinical correlation is required." R. 430-31. An MRI also failed to reveal the cause of her seizures. R. 432.

On June 18, 2005, Plaintiff went to the emergency room due to a seizure, and her medications were increased because her Tegretol level was 1.4, and when it was checked two days later it was 10. R. 425.  Four days later she was staggering with slurred speech and diagnosed with probable Tegretol intoxication, "primary generalized seizure disorder intractable," a tremor secondary to Depakote, and chronic daily headaches secondary to transformed migraines. R. 425; see also R. 429 (April 2005); R. 421 (October and November 2005).  When Dr. Smith retired, Plaintiff began treatment with Dr. Pervier, a neurologist, in conjunction with a program through the State of Alaska Department of Health and Social Services Division of Public Assistance and due to her high risk pregnancy with epilepsy.  *See* R. 408, 418, 445.  Dr. Pervier opined that Plaintiff could not work as of May 2006 due to "epilepsy," and he prescribed Tegretol. R. 410, 414; R. 408 (September 2006).

Plaintiff subsequently switched neurologists in November 2006 to Dr. Makim, who could see her more often than Dr. Pervier could during her pregnancy (R. 445), and he noted on her initial exam that her "seizure type diagnosis is unclear, it is conceivable that she had low Tegretol as a cause of seizure" but he thought "she has mixed or atypical absence and GTC [generalized tonic-clonic seizure[6]], for which Tegretol is not the right medication and Depakote, Keppra or Lamictal may be

---

[6]Also known as grad mal seizures.

the better choice." R. 446.  Plaintiff delivered her third child in December 2006, and in January 2007, Dr. Makim ordered her to have labs and a new EEG done to decide whether to change seizure medications from Tegretol to Lamictal or newer agent.  R. 444.  His diagnosis was "seizure disorder mixed atypical absence with generalized tonic clonic vs complex partial secondary generalization, intractable; post-partum worsening?" R. 444.  An April 2007 EEG reported abnormal results, which suggested underlying irritability, and would be consistent with a "generalized seizure disorder."  R. 438.

Following the EEG results, in May 2007, Plaintiff reported nearly weekly seizures, and the neurological exam revealed slow reaction time. R. 442.  Plaintiff was assessed with an intractable seizure disorder, headache, tongue laceration, and memory impairment due to ongoing seizures. R. 442[7].  Dr. Makim increased her Tegretol although he noted that she had memory impairments due to ongoing seizures and her current control was poor likely due to low Tegretol, but another issue was also "likely ineffectiveness of Tegretol[8]."  R. 442, 446.

A July 2007 EEG was abnormal and "consistent with a generalized seizure disorder," and Plaintiff's Tegretol was increased at the time. R. 438, 441. In September 2007, Plaintiff reported having had a seizure the day before and during the appointment she was crying and extremely tremulous, fidgety, and restless on examination. R. 490. She was assessed with "seizure disorder, chronic, intractable, complex partial, secondary generalization" and cause undetermined. R. 485, 490. Dr. Makim noted it was "not clear why she changed from Keppra to Tegretol; suspect environmental, toxic, drug, social, psychological causes for anxiety, stress, seizure." R. 490.  He recommended that she make sure to see a psychiatrist.  R. 490. At the November 2007 appointment, Plaintiff reported

---

[7]Plaintiff does not drive and her inability to arrange transportation reportedly caused her to miss appointments. R. 442.

[8]The ALJ notably omits in her description of Dr. Makim's notes the "likely ineffectiveness of Tegretol."  *See* R. 21.

having had a seizure on Halloween and was having recurrent severe throbbing headaches with neck pain. R. 485.  She was advised to continue seeing the psychiatrist.  R. 485.

The seizures continued through 2006 to 2008 and Dr. Makim, consistently confirmed his opinion that Plaintiff could not work due to a "seizure disorder." R. 480 (April 2008), 488 (November 2007), 493 (September 2007), 521 (November 2006).  In April 2008, Plaintiff reported ongoing seizures, witnessed by her husband, occurring two to three times per week, and that she was experiencing neck pain, occipital pain, migraines, depression, fatigue, and memory problems. R. 477. Dr. Makim diagnosed intractable seizure disorder, intractable chronic migraine and tension headache, chronic anxiety depression, possible bipolar illness, and substance abuse. R. 478.  Dr. Makim noted that Plaintiff had possible cognitive problems during change over to a different seizure medication, and a change in her seizures. R. 481.  He recommended that Plaintiff change over to the different seizure medication, have an EEG, coordinate with a psychiatrist, and be seen for a neuropsychiatric evaluation to rule out cognitive dysfunction and motivational issues. R. 478, 481.  Plaintiff reported at that time that she had recently been seeing one psychiatrist but was transferring to another who had reportedly diagnosed her with bipolar disorder. R. 477.  Plaintiff then relocated to Florida and records from the Osceola Regional Medical Center Emergency Room indicate she was seen there in 2008 and 2009 seeking medication refills of the Tegretol for "epilepsy."  R. 545-564.  At one point, she had six refills left on her prescription bottle but she could not afford to pay for them.  R. 551.

The ALJ gave limited weight to the records and opinions of the treating physicians Dr. Pervier and Dr. Makim, despite both of their specializations in neurology because their opinions were "not consistent with the medial evidence of record." R. 21[9].  However, there is extensive history of testing and treatment of Plaintiff from 2000 to 2009 for a seizure disorder – some doctors refer to the

---

[9]In the following paragraph at the top of R. 22, the ALJ also states she has assigned "some weight" to the opinion of Dr. Makim.

condition as "epilepsy" and some as a "generalized seizure disorder." Regardless of which condition Plaintiff suffered from, every neurologist prescribed the medication Tegretol as treatment[10] – apparently contrary to Dr. Willer's opinion for treatment.

The ALJ's short-shrift two-paragraph analysis of Plaintiff's complicated seizure history as described by Dr. Willer, and the ALJ's failure to recognize and discuss Dr. Willer's equivocal opinion of Plaintiff's impairments was not based on substantial evidence.  Moreover, the ALJ erred in failing to order testing of Plaintiff at an epilepsy monitoring unit, which Dr. Willer testified would unequivocally determine whether Plaintiff had "bona fide epilepsy" or psychogenic seizures, or a mixture of both.  R. 658 ("In order to parse this out, one would need her admitted to an epilepsy monitoring unit, which should be fairly easy to report, because she says she has two or three grand mal seizures a day, and you'd be able to see whether or not these events . . . were actually bona fide epilepsy, or whether they were completely psychogenic, or whether or not, you know, it was a mixture.").  Even if Plaintiff suffered solely from psychogenic seizures, these could be of listing level according to Dr. Willer.  The ALJ's failure to determine the cause of Plaintiff's seizures was error, and as such the decision is not based on substantial evidence.

On remand, the ALJ will be required to reassess Plaintiff's physical RFC, identifying her functional limitations or restrictions and evaluating her work-related abilities on a function-by-function basis as required.

**B.     Assessment of Plaintiff's mental limitations**

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's mental RFC because she completely ignored the evidence from Dr. Austin and Dr. Ysern, and Dr. Gideon, even though Dr. Willer explicitly acknowledged the relevance of the 2001 neuropsychological testing by Dr. Austin

---

[10]Some doctors also prescribed additional medication, such as Depakote.

and Dr. Ysern which showed Plaintiff had significant memory deficits, which would not be expected to improve. R. 656.

Because Plaintiff alleged she suffered from mental impairments, the ALJ conducted a Psychiatric Review Technique (PRT) to analyze those impairments.  R. 19-20.  The ALJ found Plaintiff had moderate restriction in activities of daily living, mild difficulties in social functioning, and moderate difficulties with concentration, persistence, and pace.  R. 19.  The ALJ found Plaintiff retained the RFC to perform only simple tasks on a regular basis. R. 20.

Plaintiff contends that, where the results were inconsistent, the ALJ erred by not recontacting the doctors for more information or mentioning the testing anywhere in the ALJ's decision. She argues that the 2004 evaluation was less thorough, with testing consisted only of "[a] non-verbal measure of intelligence [the Test of Non-Verbal Intelligence] . . . in order not to put undue stress on her epilepsy," (R. 354) and the prior, more thorough testing of her memory corroborates her testimony about her impairments.  R. 585, 610.  Plaintiff also argues that the ALJ erred in failing to cite or discuss the report of Dr. Gideon, whose assessment of Plaintiff's neurocognitive functioning showed in part "moderate-to-severely impaired memory for spoken language and for visuospatial information." R. 542.  Plaintiff argues that the ALJ erred in not addressing the serious memory deficits revealed by the 2001 RBANS testing and Dr. Gideon's 2000 report, and their impact on Plaintiff's RFC.

Neurological testing in January 2000 by Dr. Gideon indicated Plaintiff was "functioning intellectually generally at a low-average level and that she [was] experiencing a pattern of generally moderate-to-severe neuropsychologlcal impairments, primarily in memory, in complex attention, and in reasoning and problem solving abilities, and particularly in mental and written arithmetic skills." R. 543.  The deficits were "very likely associated with her history of a seizure disorder and are expected clearly to compromise her success in completing her education."  R. 543.  She was

diagnosed with dementia due to seizure disorder, mathematics disorder, major depressive disorder, recurrent, moderate; seizure disorder, and assigned a Global Assessment of Functioning of 45. R. 544.

In a joint report in August 2001, the psychologists Drs. Austin and Ysern administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS") to Plaintiff, who, despite giving her best effort at all times and producing valid test results, scored in the .2 percentile on the total scale. R. 313.   The score revealed deficits in both immediate and delayed capacity memory, with overall impairment in neurocognitive functioning that "is more marked in memory areas and suggest an amnestic syndrome of unknown etiology." R. 313-14. The psychologists diagnosed dysthymic disorder and amnestic disorder, not otherwise specified. R. 314.

When Dr. Ysern tested Plaintiff in April 2004 for another disability (R. 352-55) he used a different test, "[a] non-verbal measure of intelligence [the Test of Non-Verbal Intelligence] . . . in order not to put undue stress on her epilepsy" and "[i]t was felt that an extensive intellectual battery would be detrimental to her health." R. 354.   Dr. Ysern noted that her tongue was overactive and continually trembling; her speech was impaired and she had difficulty articulating words; at times she was difficult to understand and she stuttered.  R. 353.  She told Dr. Ysern that her speech became that way after her seizures, and she had had a seizure the day before, thus she was having trouble speaking all day.  R. 353.  Plaintiff scored at the 42nd percentile.  R. 354. Dr. Ysern concluded the "[e]xaminee has a normal capacity for understanding, memory, and concentration. Her general functioning is quite adequate except for the disturbances when she has seizures. This would certainly present difficulties in employment settings." R. 354. Dr. Ysern diagnosed dysthymic disorder, and panic disorder without agoraphobia.  R. 354-55.  Dr. Willer, at the hearing, testified that he was unable to "really reconcile" the test results with the assertion of essentially normal memory in 2004 by Dr. Ysern.  R. 656.

On remand, the ALJ will be required to consider the psychological and neurological testing by Dr. Gideon in 2000, Drs. Austin and Ysern in 2001, and Dr. Ysern in 2004.   The ALJ will also

state the weight given to Dr. Weber's 2004 opinions that Plaintiff was moderately limited in maintaining attention and concentration for extended periods; accepting instructions and responding appropriately to criticism from supervisors; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  R. 356-69.

### C.    Pain and credibility.

Plaintiff asserts that the ALJ erred in evaluating her credibility by discounting the limited nature of her daily activities, her alleged noncompliance with prescribed medication, and her limited work history.  R. 22-24.  The Commissioner contends that the ALJ properly evaluated Plaintiff's symptoms regarding her symptoms and found they were not entirely credible based on evidence in the record.

Where an ALJ decides not to credit a claimant's testimony about subjective symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).  Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560 (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

Plaintiff contends that the ALJ erred in assessing her daily activities by finding that "it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence." R. 23. The ALJ also found Plaintiff's reported activities of daily living were inconsistent with disability because "treatment notes indicate that the claimant was able to care for her young children at home, which can be quite demanding . . . without any particular assistance, with occasional assistance from family members" (R. 23), which Plaintiff argues overlooks the simple fact that she does not experience seizures constantly and can care for her children at home until a significant seizure occurs, triggering the need for occasional assistance from family members. Plaintiff also argues that the ALJ erred in finding her "earnings record reflects a work history consistent with only a sporadic work history prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." R. 24.

As discussed at length above, the ALJ erred in assessing the medical evidence, which was not "relatively weak" as the ALJ characterized it, and as such, her assessment of Plaintiff's credibility was not based on substantial evidence. On remand, the ALJ will be required to assess Plaintiff's credibility as to her activities of daily living, her alleged non-compliance with medication, when considering the nature of Plaintiff's seizure condition and impairments. The ALJ should not consider Plaintiff's lack of work history as undermining her allegations of disability in light the fact that her

seizures started at age 12 and, given that medical treatment with Tegretol for what may be psychogenic seizures would possibly not have controlled them, as Dr. Willer testified.

As Plaintiff also points out, due to the ALJ's errors in assessing the medical evidence and her credibility, the ALJ's hypothetical questioning to the VE did not fully reflect her limitations and must be addressed as well. On remand, the ALJ will also be required to give adequate consideration to the testimony of Minerva Colvin, the mother of Plaintiff's boyfriend, which the ALJ had found was inconsistent with the medical evidence of record. R. 22.

## IV.    CONCLUSION

For the reasons set forth above, the ALJ's decision is not consistent with the requirements of law and is not supported by substantial evidence. Accordingly, the Court **REVERSES** and **REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on July 11, 2013.

_David A. Baker_

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record